**ROTHSCHILD et al. v. JEFFERSON HO-TEL CO. et al. (HANKE et al., Interveners).**

No. 2576.

District Court, E. D. Missouri, E. D.

June 16, 1944.

Meyer Abrams, of Chicago, Ill., and Melvin L. Hertzman, of St. Louis, Mo., for plaintiffs.

Rhodes E. Cave (of Bryan, Cave, McPheeters & McRoberts), and Henry P. Perriss (of Goodbar & Ferriss), both of St. Louis, Mo., for defendant Jefferson Hotel Co.

Harold C. Hanke and Victor B. Harris, both of St. Louis, Mo., for interveners.

HULEN, District Judge.

I. Defendant, Jefferson Hotel Company,[1] in 1934, as the result of reorganization proceedings, issued $2,978,000 of an authorized bond issue of $3,025,000, and executed its mortgage deed of trust to secure same.[2] The amount of $222,500 in bonds has been retired since April 1, 1934, leaving now outstanding $2,756,000 of such bonds, of which $147,000 are now held in the treasury of the corporation uncancelled. From April 1, 1934, to December 31, 1943, interest has accrued and remains unpaid on said bonds in the sum of "about $809,875.00" not including premium.

In December, 1943, the corporation, claiming to act in accord with the trust indenture, submitted to the holders of outstanding bonds a plan of exchange as a part of a refinancing plan of its bond indebtedness. An amendment was made to the plan as of February 15, 1944, when an amended plan of exchange was submitted to the bondholders.

The corporation has advised the bondholders on various occasions, between December 11, 1943, and April 22, 1944, that under the terms of the indenture the holders of 75% of the outstanding bonds could, by their approval, make the plan of exchange effective and binding on the holders of all outstanding bonds. By February 21, 1944, the holders of more than 75% of bonds had filed written consent to the plan of exchange and the corporation addressed a communication to all bondholders informing them of that fact. At the same time the bondholders were told that the plan would not become effective until the section of the trust indenture, which the corporation claimed authorized the procedure had been construed as applicable to the action taken by the company.

Holders of $573,000 in bonds refused to consent to the exchange plan. Plaintiffs and interveners are the bondholders who have not consented to the plan of exchange. It is their position (1) that holders of 75% of the bonds cannot bind the nonconsenting bondholders to the plan of exchange proposed by the corporation under the terms of the trust indenture; (2) that if the trust indenture is susceptible of the construction placed upon it by the corporation, it should not be permitted to proceed, because of misrepresentation of facts to the bondholders in obtaining their consent. There are other collateral issues.

Facts pertinent to the questions presented are as follows:

The Circuit Court of the city of St. Louis on June 1, 1934, approved a plan of reorganization and purchase by Bondholders Protective Committee of the properties securing the present bond issue. In exchange for coupon bonds the bondholders, in the consummation of the 1934 reorganization proceedings, received income bonds which the corporation is now proposing to refinance. The bondholders also received in the 1934 reorganization, certain shares of stock in the corporation, with a privilege of converting bonds into stock.

The trust indenture provides for the application of the income of the corporation, as follows: (Art. 3, Sec. 5, pages 37 to 39

---

[1] Hereinafter referred to as "Corporation".

[2] Said mortgage deed of trust hereinafter referred to as "Indenture".

Trust Indenture) that the corporation will on or before the 13th day of March, during the term of the bond issue (1935–1948 and on the first day of April 1948) pay over to and deposit with the trustee the *entire* net income of the corporation for the preceding year to be applied by the trustee:

First: Interest up to the rate of 4% per annum on all income bonds outstanding;

Second: $60,000 to the sinking fund, provided in Article 5 of the indenture;

Third: Interest up to the rate of 2% per annum on all income bonds outstanding;

Fourth: To the payment of the single premium on all income bonds outstanding equal to 6% of the principal amount of such bonds unless such premium shall have been paid in full;

Fifth: The balance, if any, of such net income shall be paid over to the sinking fund, provided for in Article 5 of the indenture.

As of December 31, 1943, interest accrued and unpaid on the income bonds was "about $809,874.00". The single premium of 6% referred to under item "Fourth" had never been paid, because not earned until 1943. The net income for 1943 was $442,584.42. If this income is applied by the trustee under the terms of the trust indenture it would result in distribution by the trustee:

| | |
|---|---:|
| Interest at 6% | $165,360.00 |
| Sinking Fund | 60,000.00 |
| Payment of a single premium on all income bonds outstanding equal to 6% of the principal amount of such bonds | 165,360.00 |
| Balance to be paid over to the Sinking Fund or used to apply on accumulated unpaid interest | 51,864.42 |
| Total .................. | $442,584.42 |

The amended plan of exchange proposes that for each $1,000 income bond the holder will receive:

"$60.00 in cash for payment of interest at 6% from April 1, 1943 to April 1, 1944.

"$640.00 in cash to apply on principal of general mortgage bonds now outstanding.

"$360.00 principal amount of new general (second) mortgage bonds."

The corporation proposes to borrow $1,700,000 to be secured by a new first mortgage on its property. The proceeds of this loan, together with part of the company's 1943 earnings, will be used to carry out the plan; thus resulting in application of the 1943 earnings as follows:

| | |
|---|---:|
| Interest at 6% to present bondholders | $165.360.00 |
| To corporation (and to pay balance of $640.00 in cash to each bondholder) | 277,224.42 |
| Total ..............[3] | $442,584.42 |

The new plan provides that after payment by the corporation of $144,000 annually to apply on interest at 4½% and balance for reduction of principal of the new first mortgage loan of $1,700,000, the remainder of the net yearly earnings will be distributed by the trustee:

"First: To pay interest at 4% per annum on the general mortgage bonds;

"Second: Of any balance remaining to apply $30,000 for bond retirement of the general mortgage bonds;

"Third: From any balance remaining to pay 2% additional interest;

"Fourth: Any balance remaining to be available *to the company for its corporate purposes.*"

The trust indenture of the present income bonds provides that while the interest shall be cumulative, the corporation is not obligated during any year to pay any further sum in addition to the net income for that year, and the unpaid interest not covered by the net income for any year is payable only upon maturity or redemption of the income bonds. Under the plan of exchange if the net earnings for any year are not sufficient to provide 6% interest and $30,000 for bond retirement on the general mortgage bonds the corporation is relieved of any further obligation for the year in which the delinquency occurs.

The corporation's outstanding bonds contain the following provision: "For a description of the property mortgaged and

---

[3] After making up the balance to pay the cash to bondholders, there will be a substantial sum (over $300,000.00) left to the corporation from the 1943 earnings, which under the indenture now belongs to the bondholders, or sinking fund.

318

pledged under said Indenture, the nature and extent of the security and the terms and conditions upon which the bonds are issued and secured, and the rights of the holders of the bonds, reference is hereby made to said Indenture, to all the terms and provisions whereof the holder has, by the acceptance of this bond assented."

The trust indenture referred to in the bond contains this provision:

"Without in any manner limiting the rights and powers of the Trustee in this Indenture set forth, the holders of three-fourths (¾) in principal amount of all of the bonds hereby secured and for the time being outstanding, by their votes at a meeting of bondholders called by the Trustee on such notice as the Trustee may deem sufficient, or by an instrument or instruments in writing by such holders signed, shall have power:

"(1) to assent to and authorize the release of any part of the property mentioned herein and conveyed to or held by the Trustee hereunder, and

"(2) to assent to and authorize any modification or compromise of the rights of bondholders and of the Trustee against the Corporation or against any portion of the trust estate, whether such rights shall arise under this Indenture or otherwise;

"(3) to assent to and authorize any modification of the provisions of this Indenture which shall be proposed by the Corporation and recommended by the Trustee, and

"(4) to extend the due date of the principal of all bonds secured hereby to a date not later than April 1, 1953; and any such action taken with the assent or authority given as aforesaid shall be binding upon the holders of all of the bonds hereby secured and upon the Trustee, as fully as though such action were specifically and expressly authorized by the terms and conditions of this Indenture".

The corporation would put into effect the amended plan of exchange and make it binding upon the holders of all the bonds secured by the indenture, by virtue of the language contained in the indenture, to-wit: "(2) to assent to and authorize any modification or compromise of the rights of bondholders and of the Trustee against the Corporation or against any portion of the trust estate, whether such rights shall arise under this Indenture or otherwise."

Plaintiffs and interveners assert that power to proceed with the plan of ex-change proposed does not exist absent approval by the trustee and point to the following language of the indenture to sustain their position: "(3) to assent to and authorize any modification of the provisions of this Indenture which shall be proposed by the Corporation *and recommended by the Trustee.*"

We believe that the position of the parties to this cause, in attempting to place authority for what the corporation is now proposing to do in a single one of the four powers given to holders of three-fourths of the outstanding bonds, has resulted in confusion as to application or meaning of the provisions of the trust indenture.

At the outset we state the rules governing construction of such instruments as we understand them.

■ The bondholders are charged with knowledge of the contents of the trust indenture. This results from the reference in the bonds to the terms of the trust indenture. See Muren v. Southern Coal & Mining Co., 177 Mo.App. 600, 160 S.W. 835, 836.

■ Provisions in the trust indenture, reasonable in their application, and which tend to afford protection of the security for the benefit of all the bondholders, are sustained as a general policy of the law.

"Therefore, when such provisions are inserted in the mortgage and the provisions of the mortgage aptly referred to in the bonds, as here, *in plain and unambiguous terms, the courts universally give them effect as a proper means of protecting the security for the benefit of the entire series of bonds.*" Muren v. Southern Coal & Mining Co., supra. (Emphasis added.)

It will be noted in reading the decisions of our Appellate Courts on this subject that usually the Courts draw attention to the protection afforded the bondholders by provisions in trust indentures such as we are now considering. This should not be overlooked in determining the rights of the corporation and bondholders in this case.

■ Further rules bind this Court in determining how the trust indenture shall be construed. See Du Pont De Nemours & Co. v. Claiborne-Reno Co., 8 Cir., 64 F. 2d 224, loc. cit. 227, 89 A.L.R. 238:

"The common or ordinary meaning of language will be applied to the words of a

contract in the absence of anything to show that they were used in a different sense. E. H. Stanton Co. v. Rochester G. U. Agency, D.C., 206 F. 978, 983; Hill v. Travelers' Insurance Co. of Hartford, Conn., 146 Iowa 133, 135, 124 N.W. 898, 28 L.R.A.,N.S., 742; 2 Williston, Contracts, § 618; 13 Corpus Juris, 531.

*"The writing must be construed as a whole, and all its provisions read together.* O'Brien v. Miller, 168 U.S. 287, 298, 18 S.Ct. 140, 42 L.Ed. 469; Green County, Ky., v. Quinlan, 211 U.S. 582, 594, 29 S. Ct. 162, 52 L.Ed. 335; United States v. Ansonia Brass & Copper Co., 218 U.S. 452, 467, 31 S.Ct. 49, 54 L.Ed. 1107; Merrill-Ruckgaber Co. v. United States, 241 U.S. 387, 392, 36 S.Ct. 662, 60 L.Ed. 1058; Mutual Life Ins. Co. of N. Y. v. Kelly, 8 Cir., 114 F. 268, 278; Hearin v. Standard Life Ins. Co., D.C., 8 F.2d 202, 203; 2 Williston, Contracts (1920) § 618; 13 Corpus Juris, 525, and cases cited.

*"If possible, a court will give effect to all parts of an instrument, and a construction which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable.* Canadian Northern R. Co. v. Northern Miss. R. Co., 8 Cir., 209 F. 758, 761, 762; Rushing v. Manhattan Life Ins. Co. of New York, 8 Cir., 224 F. 74, 76; Pillsbury Flour Mills Co. v. Great Northern R. Co., 8 Cir., 25 F.2d 66, 69; *2* Williston, Contracts (1920) § 619; 13 Corpus Juris, 527, and cases cited." (Emphasis added.)

With these rules in mind we pass to the contract before the Court.

The first power (1) gives the holders of three-fourths of the outstanding bonds power to assent to the release of the property secured by the indenture. The second power (2) gives to the holders of three-fourths of the outstanding bonds power to authorize modification or compromise of the rights of the bondholders against the corporation. The third power (3) gives to the holders of three-fourths of the outstanding bonds power to authorize modification of the provisions of the indenture when proposed by the corporation *and recommended by the trustee.* The fourth power (4) is not involved in this case.

As we understand the amended plan of exchange *proposed* by the corporation it will require release of the property held by the trustee as security for the outstanding bonds in order that the new loan of

$1,700,000 may be "secured by a new first mortgage". Authority to make this release upon the part of the holders of three-fourths in amount of the outstanding bonds is found in power (1).

There is now an unpaid obligation of the corporation for interest accrued and unpaid on the outstanding bonds in the principal amount of "about $809,874.00". Out of the earnings for 1943 there is due in the sinking fund for retirement of outstanding bonds $60,000; there is due the bondholders the 6% premium, totaling approximately $165,360; there is due a balance to the sinking fund of $51,864.42. These rights under the proposed amended plan of exchange are to be waived by the bondholders. Power to compromise rights of the bondholders against the corporation, by the holders of three-fourths of the outstanding bonds, is found in the second (2) power.

In order to carry into effect the amended plan of exchange, proposed by the corporation, it is necessary that the provisions of the indenture securing the outstanding bonds be modified. In the communication which the corporation addressed to the bondholders on February 21st, 1944 (Plaintiff's Exhibit 18) after explaining the amended plan the corporation stated: *"The remaining provisions of the new General Mortgage will be substantially the same as the provisions in the present General Mortgage* after eliminating provisions for conversion and exchange for coupon bonds, and *making such other changes as may be necessary to be consistent with this Plan".* (Emphasis added)

A new trust indenture is to be executed as a matter of form. Admittedly there will be a modification of the provisions of the present trust indenture. Certain provisions of the present indenture "will be substantially the same"; and after eliminating certain provisions there will be made "such other changes as may be necessary to be consistent with this plan". Power of holders of three-fourths of the outstanding bonds to *"authorize any modification of the provisions of"* the trust indenture, when proposed by the corporation, *must be "recommended by the trustee"* under power (3).

The corporation seeks an interpretation that will eliminate and ignore power (3) and consider only power (2) and from power (2) extract authority for the procedure undertaken by them. No reason

suggests itself to the court justifying such an interpretation of the indenture. It will be no "protection to the security for the benefit of the entire series of bonds." On the other hand many reasons suggest themselves to the court why we should observe and give a meaning to all the powers given to the holders of three-fourths of the outstanding bonds, exercise of which is required to approve what the company is attempting now to do.

Under the first (1) power there does not appear to be any impelling reason why the trustee should join with the corporation or take any action. This simple question is presented to the bondholders—do you or do you not agree to release part of your security?

Under the second power (2) there is presented to the bondholders the proposition: You have certain rights. Do you approve compromising all those rights on the conditions submitted? The answer is yes or no.

But modification of the trust instrument is more complex. Here we have a bond issue held by widely scattered bondholders. If the indenture is to be modified that character of proposition cannot be submitted in the alternative to the bondholders. This is evidenced by the communication of the corporation to the bondholders dated February 21st. The bondholders were advised that certain provisions of the mortgage would be *substantially* the same as the present provisions of the mortgage; that there would be *"other changes as may be necessary"*. The bondholders are entitled to some agency for their protection in modifying the indenture securing their bonds. The indenture gives it to them. This Court has no power to take it away.

■ The "amended plan of exchange" submitted to the bondholders and proposed by the corporation, requiring extensive and basic modifications in the provisions of the trust indenture, not having been recommended by the trustee, as required by the indenture, the holders of three-fourths of the outstanding bonds are without power to put the plan into effect and bind non-consenting bondholders.

■ To sustain the position of the corporation that its right to proceed with the "exchange plan" is governed by the second (2) power referred to in the indenture, and that the provisions and conditions of the third (3) power should be ignored, it would have to appear either by express language or by necessary implication that such was the intention of the parties to the indenture as revealed by the instrument itself. The restriction contained in power (3), that a proposal of the corporation to modify the indenture must be recommended by the trustee, is a right, too valuable in character and for the protection of the bondholders, to be taken away by implication. Manning v. Norfolk Southern R. Co., C.C., 29 F. 838, loc. cit. 839.

■ The language of the indenture, as set forth in power (2) does not, in express terms or by necessary implication, authorize the procedure adopted by the corporation to the exclusion of complying with power (3). There can be no question but what the exchange plan is a proposal by the "corporation" of the kind referred to in power (3) and that its execution calls for modification of the indenture. The language of power (3), taken in its "common or ordinary meaning", more expressly controls, both by the terms used and by necessary implication, what the company is proposing to do, than does the language used in power (2). See Du Pont De Nemours & Co. v. Claiborne-Reno Co., 8 Cir., 64 F.2d 224, loc. cit. 227, 89 A.L.R. 238.

Going back to the occasion when this indenture was executed: what were the intentions of the parties? See Leschen & Sons Rope Co. v. Mayflower Gold Mining & Reduction Co., 8 Cir., 173 F. 855, loc. cit. 857, 35 L.R.A.,N.S., 1. The corporation states in its brief that even then— when the indenture was executed, "we feared that the company would not be able to meet its" obligation under the indenture and "we inserted the provision giving 75% of the bondholders the power to comprise the claim of all bondholders". The same "authority" inserted in the indenture power (3) providing and directing that when the company reached the point then contemplated (as we are now advised) and wanted to modify the terms of the indenture and proposed same, as it is now doing, that it was required to get the recommendation of the trustee. Would any one have been so naive, at that time, as to suggest that the corporation could propose a modification of the indenture of the nature set forth in the plan of exchange, and that the provision for protection of the bondholders, requiring the approval of such modification by the

trustee in said circumstance, was to be treated as "useless" language inserted solely for "window-dressing" purposes.

The corporation argues that the trustee has deposited its bonds and thereby expressed its approval of the plan. Does the corporation claim that is a compliance with the terms of the indenture? *Have the bondholders been advised by the trustee that it "recommends" the exchange plan?* If not, then it is idle to consider what the trustee has done, other than as trustee under the indenture. Power (3) could have been inserted in the indenture for no other purpose than to afford the bondholders representation and an agent charged with looking after their interest, in a situation of the character presented by this record.

If the trustee is not to represent the bondholders in a case where modification of the indenture is as manifest and material as that presented by the exchange plan "proposed by the corporation", then we ask, who will? It cannot be expected that the company in rewriting and modifying the indenture can represent itself and the bondholders at the same time. Nor can it represent the trustee for the bondholders. The interest of the corporation and the bondholders (and trustee for them) are conflicting.

On "recommendation" from the trustee we are informed by the corporation, it reconsidered its plan of exchange, and changed the plan to provide payment of interest for 1943 to the bondholders in the sum of $165,360 out of the 1943 net earning of $442,584.42. If such a substantial concession can be made on mere "recommendation" of the trustee, is it not to be at least hoped, that the able alert trustee, functioning as such, may obtain or at least explore the possibility of further benefits possible for the bondholders and consistent with fair treatment of the corporation?

The present bondholders waived the right of a "coupon" bondholder for that of an "income" bondholder in the 1934 reorganization. Now the corporation has proposed to said bondholders a waiving of part of the "income" in favor of the stockholders. This may be desirable on behalf of the stockholders, but can it be said to be *necessary in order to save this company from the debilitating effects of a receivership?*[5]

True the stock of the corporation is widely held by a great many of the bondholders, but the officers of the corporation are the large stockholders. The manager-secretary-treasurer testified:

"Q. So that when you add them all together, that is, the Board of Directors, and your family, and Mr. Teich's family, you own at least working control, practically fifty per cent, don't you? A. Well, about forty per cent.

"Q. About forty per cent, but that is working control—I mean the rest of the stock is widely scattered, isn't it? A. I assume so." (Transcript page 35–36.)

As to the bondholdings of the same parties it is "about fifteen per cent". The corporation's position is not strengthened by the fact that a large number of the bondholders are also stockholders. The plan of exchange affects only bondholders. The indenture provision, under which the company proposes to act, authorizes action on consenting of bondholders as distinguished from stockholders. Stockholders represent ownership. Bondholders represent creditors. The interests are not the same.

There is a further ground upon which we find the corporation's position untenable.

We believe that with the position occupied by the corporation and the bondholders with respect to information upon which the bondholders could base a decision as to accepting or rejecting the exchange plan (with the corporation in possession of all the information and the bondholders dependent on the corporation for their information), that before a bondholder could be held to have waived a right, *and before a bondholder should be permitted to waive another bondholder's right, over the latter's protest,* all bondholders should be informed fully and accurately what their rights are. See Fox Realty Co. v. Montgomery Ward & Co., 7 Cir., 124 F.2d 710, loc. cit. 713: "A waiver

---

[5] We have doubt that a trustee would agree and recommend a plan providing that a part of the net earnings be available for stock dividend purposes as long as its obligations (interest and principal) to the income bondholders remains unpaid. See Northern P. R. Co. v. Boyd, 228 U.S. 482, loc. cit. 504, 33 S.Ct. 554, loc. cit 560, 57 L.Ed. 931, loc. cit. 942: "Any device, whether by private contract or judicial sale under consent decree, whereby stockholders were preferred before the creditor, was invalid."

arises from an intentional relinquishment *of a known right.* Barnard v. Megorden, 94 Ind.App. 391, 178 N.E. 868; Templer v. Muncie Lodge, I. O. O. F., 50 Ind.App. 324, 97 N.E. 546. *The present record discloses no such relinquishment."* (Emphasis added.)

The efforts of the corporation to obtain bondholders' approval of its exchange plan started with its communication to the bondholders dated December 11, 1943. In this letter the bondholders were informed that the 1943 earnings would be applied to the cash payment on each bond (of $700) and to carry out the plan. The bondholders were not informed what the 1943 earnings were: *all of which were due on their bonds and which they were being asked to waive.* Between December 11th, 1943, and February 21st, 1944, there were a number of letters sent by the corporation to the bondholders. These letters contain a distinct tone of urgency. In letter of December 11th: "We urge your immediate acceptance". In a second letter of December 11th the bondholders were informed that there was a time limit on the plan. In a letter of January 12th: "There is no time to lose". A letter of January 12th concluded with this line: "The bondholders' failure to act now may cause abandonment of the plan".

Following this series of letters, on February 21st the bondholders were advised that: "More than 75% in the principal amount of all outstanding bonds have filed written consent to the plan of exchange". But that the plan of exchange must await a decree of Court. And with this information, and for the first time, there was given to the bondholders a statement of the 1943 earnings.

In a letter of December 11, 1943, the bondholders were informed that in 1948 there would be a large amount of unpaid interest accumulated under the terms of the indenture and due the bondholders. *It was represented that this liability amounted to $1,039,515 as of December 31, 1942. The financial statement sent to bondholders by the corporation, dated March 30, 1943, represented this interest item as $870,945 "at Dec. 31, 1942".* Defendant's explanation, as contained in its brief, of this difference in representation of interest liability of the corporation, as appears in the financial statement sent to bondholders in March, 1943, before the exchange plan was submitted and the representation contained in letter of the company of December 11th,

1943, is that it represented "accrued interest item as of Dec. 31, 1942 of $910,780.-00". plus the "interest premium on bonds, payable *if earned"*. Aside from the disparity in letters to bondholders as to accrued interest item as of December 31, 1942, and the financial statement sent out in March, 1943, we question the propriety of the corporation representing to its bondholders as a liability on December 11, 1943, an item of $168,570, as premium due, which was not then known to be a liability of the corporation, *although the letter stated it was "according to the report of our public accountant—".* The manager-secretary-treasurer of the corporation, who apparently was the directing head in securing bondholders' consent to the exchange plan, testified as to knowledge of the earnings (and thereby liability for the premium) of the corporation, as follows (Transcript, p. 43) :

"Q. Did you inform the bondholders in any of these communications that it had been earned and was, therefore, payable? A. Nor, sir.

"Q. It had been earned, though, as a matter of fact, hadn't it? A. I did not know that.

"Q. Well, you knew it on February 21, 1944? A. That is right. *That is the first time."* (Emphasis added)

We can draw no other conclusion from this conduct by the corporation than that it was their policy to use all resources in presenting its financial condition as critical as possible, to its bondholders, to induce them to accept the exchange plan. Doubts were resolved in favor of creating liability against the corporation. The manager-secretary-treasurer further testified (Transcript 44) :

"Q. The bondholders, in this communication then were not informed that they were entitled, or that the money was available for the payment of this six per cent premium included in the bond indenture? A. *No, because we were telling them that we were trying to put through this plan.*

"Q. Did you at any time tell them, in any of these communications, that more than sixty thousand dollars was available for sinking fund purposes? A. No."

Further evidence of such a policy on the part of the corporation's management in promoting the exchange plan is found in the 1943 financial statement (Hanke's Exhibit 1) sent to all bondholders as of February 21, 1944. It shows "Total Capital

Stock and Surplus (*deficit*) $4,931.68". The last financial statement sent to the bondholders prior to this (and before submission of the exchange plan) shows "Total Capital Stock and Surplus $495,527.54" (see annual report dated March 30, 1943). Between the two reports the corporation had a net profit of over $400,000.

Plaintiff's exhibit 24 is a report made by the corporation's public auditors for the year 1943 and shows "Total capital stock and surplus—$806.534.00" as of December 31, 1943. We are informed that this latter audit was not furnished to the bondholders because "not finished in time". These different figures, one showing a deficit and the other two showing a substantial surplus, result from use of the same figures but a different manner of setting them up. The public auditors never included in their financial statement "accrued interest item", because it was not due until maturity or surrender of the bonds in 1948. In its letter of February 21st, containing a condensed financial statement, the corporation included the accrued interest item in the liability side of the financial statement, thereby causing the statement to show a deficit. The corporation repudiates the methods of its public auditors for the first time in its brief, in order to support the method used by its bookkeeper in setting up a financial statement that would show a deficit.

While the financial condition of the corporation is being presented in as bad a light as possible by the management during the campaign to secure approval of bondholders for the exchange plan, the exchange plan is adorned with all the inducements which presumption and hope for financial success on the part of the management can give it.

For example we refer to a communication from the company to the bondholders dated January 12, 1944. This was "a statement showing the advantages if the plan is adopted". "If business conditions be as good as in 1942 and 1943" the bondholders were informed that they might expect:

"(1) It will permit payment of 6% interest on the new bonds which you will receive.

"(2) *You may dispose of these bonds by offering them to the sinking fund provided through earnings.*

"(3) *This means that you will have the opportunity of getting back your original investment in full.*

"(4) In addition, the stock given to you with your present bonds will be able to pay dividends and should increase greatly in value. Any unpaid interest which is waived at this time benefits this stock. *As stockholders, therefore, you share these benefits.*" (Emphasis added)

The proposed plan provides that after paying not to exceed $144,000 yearly to be applied on interest and reduction of principal of the first loan, the balance of the income will be disposed of as follows:

1st. To pay interest at 4% per annum (on general mortgage bond).

2nd. *From any balance remaining to apply $30,000 for bond retirement by tender or redemption.*

3rd. From any balance remaining to pay 2% additional interest.

4th. *Any balance remaining to be available to the corporation for its corporate purposes.*

The general mortgage bonds to be issued will aggregate between eight and nine hundred thousand dollars and be due in April, 1953 (nine years), and since only $30,000 a year is to be paid into the redemption fund or a total of $270,000 (in nine years), there would appear to be some further explanation due the bondholders as to how they "may dispose of these bonds by offering them to the sinking fund" during those nine years. If that representation was made in good faith then there would appear to be no good reason for refinancing the outstanding bonds.

On February 1, 1944, a very urgent letter was sent by the corporation to the bondholders soliciting their consent to the plan of exchange as amended. This letter contained the following paragraph: "You may be interested in knowing that the First National Bank in St. Louis, among other large bondholders, has already consented to the plan so far as *its* bonds are concerned." We can conceive of no stronger argument to present to the bondholders for their consenting to the plan of exchange. The bondholders are informed that one of the leading financial institutions of St. Louis, in a position to investigate and pass upon the merits of the plan of exchange, and being a large holder of bonds and considering *its* own best interest, has "consented to the plan so far as *its* bonds are concerned"; therefore if the plan is acceptable under those circumstances to this financial institution, then bondholders without facil-

ities to investigate and without trained and experienced advice to pass upon the proposed plan should feel safe to give their consent. As defendant aptly states in its brief: "If you think they (referring to St. Louis Banks) are easily deceived, try it some time".

There was filed in this case Defendant's Exhibit 2, being a list of the consenting and nonconsenting bondholders. The exhibit does not reflect that the bank named owns any bonds of the corporation in its name. The only references to this bank we find in the list of bondholders is as follows:

view of the communication of February 1, 1944, wherein the corporation stated to the bondholders as a reason for submitting the amendment to the plan of exchange: "Upon the suggestion of several of our bondholders and upon the recommendation of the St. Louis Union Trust Company, Trustee under the bond mortgage, that we reconsider the plan, we have done so. As a result, the Board of Directors have decided to amend the plan to include a 6% interest payment, and also to shorten the maturity of the new bonds."

The corporation, in its brief, takes the

| Consenting Bondholders | | Non-Consenting Bondholders | |
|---|---|---|---|
| Name | Amount | Name | Amount |
| Elizabeth J. Smith, % Walter W. Smith, First National Bank, 323 N. Broadway, St. Louis, Mo. | $ 3,000 | Richard S. Hawes, % First National Bank in St. Louis, 323 N. Broadway, St. Louis, Mo. | $2,000 |
| [5] Charles F. Winters, % First National Bank St. Louis, Mo. | $17,500 | Paul P. Turpin, % First National Bank in St. Louis, St. Louis, Mo. (2) | $1,000 |

The communication to the bondholders of February 21, 1944, informed them that the amended plan of exchange would not become effective until the section of the indenture upon which the corporation was relying and proceeding had been construed "as applicable to the plan by decree of court, which we believe can be obtained without undue delay". This letter to bondholders purported to copy "Section 1 (M) of Article IX of the Mortgage", containing the powers given to the holders of three-fourths of the outstanding bonds to agree to a refinancing plan, *but did not set out the third (3) power, governing modifying the indenture, on a proposal by the corporation,* nor indicate there was such a provision in the indenture.

█ The reference to securing a decree of court came as a result of the refusal of the trustee to accept the corporation's interpretation of the indenture. In view of the provisions of the indenture requiring the recommendation of the trustee to "any modification" of the provisions of the indenture, it is our opinion that the corporation was under an obligation to reveal this fact to the bondholders, especially in

position that the trustee, as a *financial institution,* and not as trustee, for the bondholders of the defendant corporation, has deposited bonds held by them in the corporation and approved the plan that "We have the consent to the trustee in most binding form". Able counsel for the corporation argues against the record. The manager-secretary-treasurer of the corporation testified (Transcript, pp. 23-24):

"Q. Was there then any doubt in your mind that you had a right to do so under the terms of the trust indenture? A. Not in our minds, no, sir.

"Q. Was there at any time a doubt in your mind whether you had a right to do so? A. Yes—when the St. Louis Union Trust Company stated *that they would not accept it without a court decision.*" (Emphasis added.)

The corporation must know that when the objecting bondholders present the argument that all bondholders were entitled to the informed judgment of the trustee, they are referring to the terms of a contract which require that the trustee must recommend modification of the indenture on any proposal to modify by the corpora-

---

[5] Defendant, corporation, informs the Court by its brief that "Charles F. Winters, representing First National Bank of St. Louis."

tion, before the holders of three-fourths of the outstanding bonds have power to bind non-consenting bondholders. We find the Trust Company listed both under consenting and nonconsenting bondholders.

That the actions of the corporation in the several respects referred to may have been innocent of any intent to deceive or mislead can have no bearing on the effect such conduct had on the bondholders.

"It may be conceded that even without actual fraud there may be such misrepresentation, or such withholding of facts, however innocent in purpose, as to constitute constructive fraud." United Milk Products Corporation v. Lovell, 6 Cir., 75 F.2d 923, loc. cit. 927.

Nothing said by this Court should be construed as a holding, one way or the other, on refinancing of the income bonds at this time. That question is not before the Court. We are simply holding that the company should proceed as set forth in the indenture. The corporation's brief contains a statement "The St. Louis Union Trust Company, as trustee, while itself depositing its bonds, was unwilling to release the mortgage without a Court decree. This was in pursuance of the usual atttitude of trustees to assume no risk." We do not know by what authority the corporation presumes to speak for the trustee. We do know the trustee signed and accepted the indenture as trustee. There is no evidence in the record that the trustee was ever requested to exercise its duties under the power (3) of the indenture. It accepted those duties with full knowledge of their import. This Court assumes that if called upon, the trustee will perform its duty, and if the corporation presents a plan to them, calling for modification of the trust indenture under power (3), which they consider fair to all the bondholders, as distinguished from stockholders it will so advise the bondholders, in accord with the contract signed by the trustee. Attention is directed to a statement by the Supreme Court of Missouri, appearing in the case of Monticello Bldg. Corp. v. Monticello Inv. Co., 330 Mo. 1128, 52 S.W.2d 545, loc. cit. 552: "Trustees in mortgages and persons acting as members of bondholders' committees, on behalf of widely scattered bondholders who are not in a position to individually protect their own interests, must act with loyalty, fidelity, and integrity toward the interests of those they represent. They will be held strictly accountable at law and in equity to the faithful performance of the trust *which they assume.*" (Emphasis added.)

Other questions raised by plaintiff's brief, as to rights of the bondholders and obligations of the corporation, under the terms of the trust indenture, resulting from alleged change in control of the board of directors, are not passed on because the Court considers them moot. The net earnings of the corporation for 1943 are subject to distribution as provided in the indenture.

### Findings of Fact

1. Plaintiffs are nonresidents of the State of Missouri and defendants are residents of the State of Missouri, and the matter in controversy in this cause exceeds, exclusive of interest and costs, the sum of $3,000.

2. Jefferson Hotel Company is a corporation duly organized and existing under the laws of the State of Missouri.

3. On June 11, 1934, the Circuit Court of the City of St. Louis approved a plan of reorganization of the then existing bond issue which was executed by the new Jefferson Hotel Corporation changing the fixed interest of 6% on the bonds to the payment of interest from income, if any.

4. The plan also provided that a new corporation be organized which was to issue 12,000 shares; 51% thereof was to be deposited with the representatives of the bondholders and 49% was to be allotted to the chief executives and to junior interests. The chief executives had an option to acquire the 51% within a five-year period under certain conditions and if they failed to exercise their options, the deposited stock was to be distributed among the bondholders. The holders of 75% of the outstanding bonds had the right to modify the terms of the option.

5. The plan was carried out after the Protective Committee informed the bondholders of the approval of the plan and that the "coupon bonds" were ready for exchange for the "income bonds", and the bonds were so exchanged.

6. As of April 1, 1934, the Jefferson Hotel Company executed its mortgage deed of trust securing an authorized issue of $3,025,000 of its general mortgage convertible income bonds due April 1, 1948.

7. Said bonds contained, among other things, the following provisions:

(a) "Jefferson Hotel Company, a corporation organized under and existing under the laws of the State of Missouri * * * for value received, acknowledges itself indebted and hereby promises to pay to ————, or registered assigns, at the office of St. Louis Union Trust Company, a corporation, in the City of St. Louis, Missouri, the sum of ———— Dollars ($————) on the 1st day of April, 1948 * * *."

(b) "This bond is one of a duly authorized issue of bonds of the Corporation, known as its General Mortgage Income Convertible Six Per Cent Registered Bonds, limited to the aggregate principal amount of $3,025,000.00, all of like date and tenor, except as to distinguishing numbers and denominations, issued under and in accordance with and equally and ratably secured by a Mortgage Indenture of Trust dated as of April 1, 1934, duly executed and delivered by the corporation to St. Louis Union Trust Company, a corporation, as Trustee. For a description of the property mortgaged and pledged under said Indenture, the nature and extent of the security, and the terms and conditions upon which the bonds are issued and secured, and the rights of the holders of the bonds, reference is hereby made to said Indenture, to all the terms and provisions whereof the holder has, by the acceptance of this bond, assented."

8. Said mortgage deed of trust securing said bonds dated April 1, 1934, contained, among other provisions, the following: "Without in any manner limiting the rights and powers of the Trustee in this Indenture set forth, the holders of three-fourths (¾) in principal amount of all of the bonds hereby secured and for the time being outstanding, by their votes at a meeting of bondholders called by the Trustee on such notice as the Trustee may deem sufficient, or by an instrument or instruments in writing by such holders signed, shall have power, (1) to assent to and authorize the release of any part of the property mentioned herein and conveyed to or held by the Trustee hereunder, and (2) to assent to and authorize any modification or compromise of the rights of bondholders and of the Trustee against the Corporation or against any portion of the trust estate, whether such rights shall arise under this Indenture or otherwise, * * * and any such action taken with the assent or authority given as aforesaid shall be binding upon the holders of all of the bonds hereby secured and upon the Trustee as fully as though such action were specifically and expressly authorized by the terms and conditions of this Indenture".

9. Said bonds bore interest at six per cent payable out of earnings, if earned, and, if not, cumulative, but unearned interest not payable until maturity of the bonds. The mortgage provided that the net income of the corporation should be applied to make payments as follows: (1) Interest at the rate of 4% per annum on all of the income bonds outstanding, (2) $60,000 per annum to the sinking fund provided for in said mortgage, (3) interest up to 2% per annum on the income bonds outstanding, and (4) to the payment of a single premium on the income bonds equal to 6% of principal until such premiums shall have been paid in full, and (5) any balance to the sinking fund.

10. Of the original issue authorized only $2,978,000 of bonds were actually issued and only $222,500 have been redeemed since said April 1, 1934, leaving outstanding a total amount of $2,756,000 of such bonds, of which $147,000 are now held in the treasury of the Jefferson Hotel Company uncancelled. During the same period from April 1, 1934, to December 31, 1943, interest accrued and remains unpaid on said bonds, in the total amount of $809,875.

11. The bondholders were informed by the Protective Committee in its last communication relating to the 1934 plan that while the function of the Committee was at an end, its members were placed on the Board of Directors of the reorganized company for the purpose of protecting the interest of the bondholders and that the majority of the Board consists of the members of the Protective Committee.

12. The 1934 plan provided that if the representatives of the bondholders would lose control of the management of the company, then in such event, the interest at 6% was to become fixed and the sinking fund requirement of $60,000 per annum was to become obligatory.

13. On December 11, 1943, the corporation proposed a plan of reorganization which provided in substance for the placing of a new mortgage of $1,800,000 and to use the proceeds, together with cash on hand, in the sum of $587,027.52 for the purpose of distributing same among the bondholders on the basis of $700 in cash and $300 in a junior bond for each $1,000 bond.

The premium of $156,750 and the $809,875 in accumulated interest were to be waived. The communication stated that because the accumulated interest in the amount of $1,039,515 as of December 31, 1942, would become due April 1, 1948, and foreclosure and receivership were then inevitable, it was advisable for the bondholders to give their consents to the plan.

14. Many other communications were addressed to the bondholders by the corporation, urging them to execute their consents. On February 1, 1944, the plan was amended to the effect that the interest due April 1, 1944, of 6% be paid but instead of paying $700 in cash and $300 in a junior bond, the payment would be $640 in cash and $360 in a junior bond and the maturity of the junior bond was changed to the year 1953. The bondholders were informed that this was the best plan that could be submitted to prevent foreclosure and receivership.

15. After the corporation acquired over 75% in consents, the trustee of the bond issue refused to release the mortgage without a decree determining the right of the holders of 75% to make the modifications under the plan. The corporation notified the bondholders that upon advice of counsel, the consents could not be used until a decree would be entered construing the provisions of the trust instrument and this was also done for the purpose of giving equal treatment to both classes of bondholders, those who consented and those who did not consent.

16. The corporation did not inform the bondholders when the consents were solicited and obtained, that there was available for them $156,750 in payment of the premium. The communications did not expressly disclose to the bondholders that by the acceptance of the plan, they would waive the premium and waive the accumulated interest in the amount of $809,875; while the accumulated interest in excess of $1,000,000 as of the year 1942 was mentioned, it was for the purpose of impressing upon the minds of the bondholders that if they would fail to execute their consents, receivership would be inevitable because of the debt in excess of one million dollars on the accumulated interest.

17. In presenting the plan to the bondholders, the Jefferson Hotel Company undertook to furnish certain information upon which the bondholders could base their decision; the bondholders were dependent upon the corporation for information upon which to base their decision; the corporation failed to disclose material facts to its bondholders as to the financial condition of the corporation; the bondholders were requested to waive valuable financial rights, but were not informed what those rights were; inaccurate, erroneous and misleading information was furnished to the bondholders by the corporation; all prior to the obtaining and as a basis for obtaining the consent of the holders of 75% of the outstanding bonds to the exchange plan.

18. The plan of exchange submitted to the bondholders was a proposal of the corporation and provided for modification of the indenture and said plan was never recommended by the trustee as provided in the indenture.

## Conclusions of Law

1. The court has jurisdiction of the parties and the subject matter of this action.

2. The holders of 75% of the outstanding bonds of the corporation are without power to ratify the plan of exchange unless and until the plan of exchange is recommended by the trustee in the indenture.

3. Failure of the corporation to disclose material facts as to its financial condition to its bondholders; failure of the corporation to advise bondholders of their rights which they were being requested to waive and the furnishing of inaccurate, erroneous and misleading information renders approval of the plan of exchange invalid and of no binding force and effect.

4. The 1943 net earnings of the corporation are subject to distribution as provided by the terms of the trust indenture.

5. The corporation should cancel bonds of the corporation held in the treasury; the trust indenture does not authorize the use of funds of the corporation for such investments by the corporation prior to distribution of net income under the terms of the trust indenture.

## Order

The Court finds the issues in favor of the plaintiffs and against the defendant, Jefferson Hotel Company.

Decree in accordance therewith will be submitted.

Right of counsel to attorneys' fees, if any, may be submitted and determined on motion.