Gertrude Shapiro et al., Appellants, v. Chicago Title and Trust Company et al., Appellees.

Gen. No. 43,693.

Opinion filed May 6, 1946. Rehearing denied May 27, 1946. Released for publication May 27, 1946.

SHULMAN, SHULMAN & ABRAMS, of Chicago, for appellants; MEYER ABRAMS, of Chicago, of counsel.

CONCANNON, DILLON, SNOOK & ARTHUR, of Chicago, for certain appellee.

CASSELS, POTTER & BENTLEY, of Chicago, for certain other appellees.

MR. JUSTICE NIEMEYER delivered the opinion of the court.

Plaintiffs appeal from an order dismissing their complaint to construe the terms of a trust agreement, to restrain an amendment of the agreement and to

have the trust property sold under the direction of the court, and an order refusing to vacate the order of dismissal and to grant leave to file an amendment to the complaint.

Under the trust agreement, dated February 9, 1932, following a foreclosure decree and sale of the trust property situated in Evanston, Illinois, and known as the Raymond Park Apartments, the defendant trustee held title "for the purpose of the operation, management, sale or liquidation and the distribution of the income and proceeds thereof." The beneficiaries of the trust are of two classes: (1) The holders of 68,500 cumulative preferred units (par value $10 each), issued by the trust in exchange for mortgage gold bonds aggregating $685,000, secured by the trust property, and (2) The holders of 100 common units (no par value), issued to holders of junior liens.

For the purposes of our decision it is necessary to refer only to articles 2, 6, 16 and 17 of the agreement.

Article 2, defining the powers of the trustee, provides that the trustee "shall hold all of the Trust Property in trust, to sell and convert the same into cash or other personal property, . . . And said Trustee shall have full power to grant options to purchase, to contract to sell and to sell the Trust Property and any part or parts thereof on any terms, . . . to partition or exchange and re-exchange the Trust Property or any part or parts thereof for other real or personal property, encumbered or unencumbered, or any part or parts thereof, as often as desired; to sell, contract to sell, lease and sublease, assign, dispose of, convert and re-convert the same; . . . *provided, however,* that the Trustee shall not, except as herein otherwise specifically provided, prior to the termination of this trust, make any . . . sale, lease, sublease, mortgage, assignment, contract or other disposition of any of the property at any time held by it under the provisions of this trust, nor make

any disbursements of any funds under this trust, for any purpose whatever, nor perform any acts or duties under this trust, except upon written order signed by the Trust Managers as hereinafter provided, it being the intention hereof that the affairs of this trust shall, except as herein otherwise specifically provided, be directed in all things by such Trust Managers.''

Article 6 provides that the holder of each cumulative preferred unit shall be entitled to cumulative distributions thereon at the rate of 30 cents, but no more, per annum, and that ''In the event of the termination of the trust or a sale of all the Trust Property or upon any distribution of the capital of the trust there shall be paid to the holders of the Cumulative Preferred Units of Beneficial Interest the sum of $10 per unit and the amount of all unpaid accumulated distributions thereon before any sum shall be paid or assets distributed among the holders of the Common Units of Beneficial Interest; and after the payment to the holders of the Cumulative Preferred Units of Beneficial Interest of $10 per unit and the unpaid accumulated distributions thereon the remaining assets and funds of the trust shall be divided among and paid to the holders of the Common Units of Beneficial Interest according to the number of units held by them respectively.''

Article 16 provides: ''The Trust Managers shall have the power to amend this agreement from time to time, and all amendments shall be filed with the Trustee. If in the judgment of both the Trust Managers and the Trustee (which shall be conclusive and binding), any such amendment does not materially alter the rights of the Certificate Holders, it shall, when so filed, become binding upon all persons with or without notice. If in the judgment of either the Trust Managers or the Trustee any such amendment shall materially alter the rights of the Certificate Holders, notice shall be given to the Certificate Hold-

ers by mail in such form as shall be designated by the Trust Managers, briefly specifying the nature of such proposed amendment, in the manner herein provided, and no such amendment shall be put into effect if within 20 days from the date of mailing such notice the holders of 35 per cent or more of the interest units represented by Certificates of Beneficial Interest then outstanding shall file with the Trustee written objections to such amendment. No such amendment or modification shall materially change or alter the duties, rights or powers of the Trustee without its consent thereto in writing."

Article 17 provides: "Section 1. Unless sooner terminated, as herein provided, this trust shall terminate 20 years from the date hereof. Section 2. This trust may be terminated at any time by an instrument in writing delivered to the Trustee signed by a majority of the Trust Managers, provided that notice of such termination in such form as the Trust Managers may prescribe, shall be mailed to all holders of certificates issued hereunder, at their addresses as shown on the books of the Trustee, and the holders of not less than two-thirds of each class of units of beneficial interest then issued and outstanding hereunder shall not disapprove in writing of such termination within 20 days from the date such notice was mailed. Section 3. Immediately upon the termination of this trust, by lapse of time or otherwise, as hereinabove provided, all of the then undisposed of Trust Property held by the Trustee hereunder shall be sold by the Trust Managers as a whole, or in parcels, at public or private sale or sales; and upon any such sale or sales, the Trustee shall have the power to transfer and convey to any purchaser or purchasers thereat (in the case of lands, by deeds without covenants) the said lands and properties of the trust, or any part or parts thereof, so purchased, and the net proceeds of such sale or sales, less the expenses thereof, and after the

payment of all costs, charges and expenses of the Trustee, of the Trust Managers, and the Bondholders Committee, shall be in proportion to the number of interest units held by such Certificate Holders, respectively.''

August 28, 1945 the trustee sent to all holders of certificates of beneficial interest in the trust a letter advising such holders that on August 14, 1945 the trust managers adopted an amendment to the trust agreement; that each holder of a beneficial interest had the right to file with the trustee on or before 20 days from the date of the mailing of the trustee's letter, written objections to the amendment, and that unless written objections were so filed by the holders of at least 35 per cent of the beneficial interest, the amendment would become effective. Enclosed with the letter was a copy of the amendment and a copy of a letter from the trust managers purporting to explain the effect of the amendment and the reason for its adoption. The amendment referred to was intended to replace original Article 17. It provided that at any time prior to the termination of the trust, all or substantially all of the property of the trust might be sold for such consideration and upon such terms as to the trust managers in the exercise of their discretion shall be deemed proper, and the trustee, upon the written direction of the trust managers, shall be authorized to consummate such sale, transfer or other disposition of the property, provided that notice of such proposed sale, transfer or other disposition, and the substance of the terms and conditions thereof in such form as the trust managers may prescribe, shall be mailed to all holders of certificates of beneficial interest, and provided that within 20 days of the date of the mailing of such notice one-third or more of the holders of certificates for cumulative preferred units of beneficial interests shall not file with the trustee their written objections to such intended sale.

transfer or other disposition; that 95 per cent of the net proceeds remaining after payment of any mortgage or certificate indebtedness and all other obligations, expenses and charges specified in the amendment, shall be distributed to the holders of certificates for cumulative preferred units of beneficial interest in proportion to their respective holdings, and the remaining 5 per cent of such net proceeds shall be paid to the holders of certificates for common units of beneficial interest in proportion to their respective holdings; that upon the consummation of any sale of all the property of the trust and distribution of the proceeds thereof, the trust shall terminate and the duties and responsibilities of the trustee and of the trust managers under the agreement shall thereupon cease; that unless sooner terminated as therein provided, the trust shall terminate February 9, 1952. The letter of the trust managers recites that several prospective buyers have become interested in the purchase of the trust property; that the trust managers had made a careful investigation of the authority granted in the trust agreement to sell the trust property, and have been advised by counsel that there is serious doubt whether the trust managers have authority to authorize the sale of the property except pursuant to the provisions of Article 17, which covers the termination of the trust; that under this article the holders of one-third or more of the preferred or common units of beneficial interest "have the right to disapprove the termination of the Trust and thereby prevent the sale of the property"; that Article 6 provides that the holders of preferred units of beneficial interest shall be paid in full, including accumulated annual distributions, before any payments shall be made to the holders of common units; that the provisions of Article 17, with reference to distribution, are ambiguous and susceptible of a possible construction permitting holders of common units to share and share

alike with the holders of the preferred units in the distribution of the proceeds of a sale, and the holders of the common units have informed the trust managers that they will disapprove the termination of the trust under any sale at a price which will not permit them to participate in the distribution of the proceeds; that it is the opinion of the trustee and the trust managers that the property cannot be sold for an amount sufficient to pay in full the holders of the preferred units and provide for any distribution to the holders of the common units; that in order to clarify the authority of the trust managers to sell the property and to eliminate the right of the holders of common units to object to a termination of the trust, an amendment to the trust agreement has been adopted, pursuant to Article 16, permitting the holders of common units to receive 5 per cent of the net proceeds from a sale of the property and giving the holders of preferred units the exclusive right to approve or disapprove a sale of the property; that in the judgment of the trust managers the proposed change is fair both to holders of preferred and common units alike, benefiting the holders of common units by securing to them a participation in the distribution of the proceeds, and benefiting the holders of preferred units by removing the right of the holders of common units to prevent a sale which might be satisfactory to the holders of the preferred units; that the holders of preferred units have received an annual distribution in the sum of $164,017.50, amounting to $2.50 per preferred unit; that no distributions have been made to the holders of common units; that the trust managers are of opinion that as an alternative to the proposed amendment it may be necessary to file a complaint in chancery for the purpose of obtaining a decree modifying the trust agreement in such manner as outlined above to accomplish the sale of the property and distribution of the proceeds; that this procedure would

require an expenditure of time and expense which might be avoided by amending the trust agreement without court action.

Within 20 days after the mailing of this letter and the enclosures, plaintiffs as owners of 250 preferred units filed their complaint "in their own right and for the use and benefit of all other preferred unit holders whose interest is identical with that of the plaintiffs," setting up the ʼforegoing facts and alleging further that under Article 2 the trustee is vested with the right to sell the property and to distribute its proceeds prior to the termination of the trust upon consent given thereto by the trust managers; that no termination of the trust and no consent of the common unit holders is essential for the purpose of making the sale and distribution, and that it is the duty of the trust managers and the trustee to exercise a sound discretion; that there is no equity in favor of the common unit holders, and that the proposed amendment whereby they will receive 5 per cent of the proceeds of any sale, without making the preferred unit holders whole, is unfair and inequitable; that many of the unit holders will be induced not to object to the amendment because of the misstatement contained in the communication from the trust managers to the effect that there is serious doubt in the opinion of the trustee and the trust managers as to the right to sell the property prior to the termination of the trust, and that no sale can be made prior to such termination; that the plaintiffs do not know the names and addresses of the unit holders and do not have a copy of the trust agreement. Plaintiffs ask that defendants be required to make available to them the names and addresses of all unit holders in order that plaintiffs may select a proper group as representatives of each class, and that defendants be required to file a copy of the trust agreement; that the court find and determine that the trustee has the power to sell the

trust property upon the consent of the trust managers prior to the termination of such trust and, upon such sale, to distribute the proceeds in accordance with the priorities of the unit holders, as set forth in the trust agreement; that the proposed amendment is unnecessary, is detrimental to the interests of the preferred unit holders, and is unfair and inequitable; that the trustee and trust managers did not give the necessary information to the beneficiaries of the trust, and therefore any consents or failure to dissent should not be considered as binding in order to make the amendment operative, and that such amendment is without force and effect; that it is the duty of the trust managers to exercise a sound discretion and to sell the trust property at the present available market; that the court fix the terms and conditions of such sale and construe any of the other terms and conditions of the trust agreement if there be any doubt, as asserted by the trustee and the trust managers. Attached to the complaint as exhibits were copies of the letter and enclosures from the trustee. Defendants having furnished a copy of the trust deed, the complaint was amended and the copy of the trust agreement attached as an exhibit. The trustee and trust managers then filed separate but identical motions to dismiss the complaint as amended. The grounds of the motions to dismiss are, that the complaint fails to state a case for equitable relief; that the amendment was properly adopted; that the trust managers exercised their judgment and discretion, and the court will not interfere with the exercise of such discretion; that it is immaterial whether the trust managers and the trustee had the power to sell the property under Article 2; that the amendment had become an accomplished fact, and the will of the beneficiaries should not be overruled.

Before disposition of these motions plaintiffs filed a "supplemental amendment" to the complaint, setting up that the trust managers had served notice they

would appear in court and ask the court to approve a form of notice to be submitted to the unit holders concerning an offer of $430,000 for the trust property; that the proposed form of notice stated that the trust managers had declared the amendment operative, and if one-third or more of the holders of the preferred units object, no sale can be consummated; that out of the proceeds of the sale there would be deducted a real estate brokers commission of $13,900, to be paid to the real estate firm of one of the trust managers, and expenses of the trust, leaving available a net sum of $301,885 for distribution (the trust property being subject to a mortgage on which there was an unpaid balance of $103,500); that of this sum there would be distributed to each of the preferred units $4.37, and available for all of the common units, $15,094.25; that such distribution to the common unit holders could only be made if the amendment is held to be valid; that plaintiffs have procured a buyer, through a broker, who is willing to offer for the property $5,000 in excess of the price heretofore made to the trust managers, and to deposit with the· clerk of the court as earnest money the sum of $10,000 and such further sum as the court may direct upon the entry of an order directing a sale of the premises free and clear to competitive bidding. By agreement an order was entered authorizing the sending of a revised notice without prejudice to the claims of the respective parties as to the validity or invalidity of the amendment of Article 17 of the trust agreement, nor as to the necessity or non-necessity of the consent of the beneficiaries to the sale.

The respective motions to dismiss were ordered to stand as motions to dismiss the complaint as amended by the "supplemental amendment," and upon hearing were sustained and the cause dismissed for want of equity. Several days later plaintiffs moved to vacate the order of dismissal and asked leave to file an addi-

tional amendment to the complaint as amended. These motions were denied. Plaintiffs appealed to the Supreme Court. Subsequently the property was sold by agreement of the parties for $503,000, from which sum, if the amendment be sustained, the holders of common units will receive approximately $20,000. With the consent of the parties the appeal was then transferred to this court.

The question presented is the validity of the amendment to Article 17. Plaintiffs concede the right of the trust managers to amend the trust agreement, provided 35 per cent or more of the unit holders do not object. They insist that the assent of the unit holders (only 2¾ per cent of the preferred unit holders having filed objections) is ineffective because of misstatements and omissions in the letter of the trust managers to the unit holders recommending the amendment as fair and equitable.

The proposed amendment, if effective, would take from the preferred unit holders 5 per cent (approximately $20,000) of the net proceeds of the sale of the trust property and give it to the common unit holders. No equities exist in favor of the latter. As junior claimants they would have received nothing in the foreclosure proceeding unless the preferred unit holders (owners of the first mortgage gold bonds) had been paid in full. Without doubt, the trust agreement was intended to preserve this situation, and Article 6 expressly subordinates payments to the common unit holders to full payment to the preferred unit holders. By acceptance of certificates of interest the original holders of the common units acquiesced in that subordination. In so doing they surrendered nothing. If the unnamed present holders of such units are persons other than the original holders, they have no greater equities than their predecessors in interest. Their threat to refuse to assent to a termination of the trust, even though sound business judgment should dictate

such termination, unless they are permitted to share in the proceeds of sale of the trust property before the preferred unit holders are paid in full, is taking an unfair advantage of an alleged failure to express the real intent of the parties to the trust agreement. Such efforts toward unjust enrichment should not be encouraged by the court or the trust managers.

Under Article 16, as defendants contend, the trust managers were merely required to send notice of the proposed amendment to the beneficiaries by mail, "briefly specifying the nature of such proposed amendment." However, the trust managers did more. They gave reasons supporting their recommendation that the proposed amendment was "fair both to holders of preferred and common units alike." In so doing they became advocates, urging the adoption of the amendment. It thereupon became their duty to disclose fully and fairly to the unit holders—and particularly to the holders of preferred units—all facts upon which such holders were required to exercise judgment in determining whether to approve or oppose the amendment. *People ex rel. Barrett v. Central Republic Trust Co.*, 300 Ill. App. 297, 309; *Rothschild v. Jefferson Hotel Co.*, 56 F. Supp. 315, 321. The communication from the trust managers omitted all reference to Article 2, which, as admitted by counsel for defendants on oral argument, at least when standing alone, gave the trust managers full power to sell all the trust property at any time, upon terms and conditions agreeable to them. We have been referred to no provision of the trust agreement limiting or restricting this power, and our examination discloses none. Under Article 17 of the original agreement, upon termination of the trust by lapse of time, or, in the manner therein provided by consent of not less than two-thirds of each class of unit holders, the trust managers are required to sell all of the then undisposed of trust property, as a whole or

in parcels, at a public or private sale or sales. Articles 2 and 17 are not inconsistent. Nowhere in the trust agreement is any right given to the unit holders to approve or disapprove the terms and conditions of any sale made by the trust managers, and only when the trust managers voluntarily submit to the unit holders the question of the termination of the trust before the expiration of the 20 year period, as provided in section 2 of original Article 17, do the unit holders have any part in determining when the trust property shall be sold—the trust managers being obligated to sell the property immediately upon termination of the trust. The trust managers in their letter to the unit holders claim that the provisions of Article 17 relating to distribution "are susceptible of a possible construction permitting holders of common units to share and share alike with the holders of the preferred units in the distribution of the proceeds of the sale." The language referred to is: "the net proceeds of such sale or sales, less the expenses thereof, and after the payment of all costs, charges and expenses of the Trustee, of the Trust Managers, and the Bondholders Committee, shall be in proportion to the number of interest units held by such Certificate Holders, respectively." This is meaningless. Something has been omitted between the words "shall be" and "in proportion." What was omitted is purely a matter of conjecture. It may have been a word like "paid," or "distributed," or it may have been and most likely was such word followed by appropriate provisions for the payment or distribution to the preferred unit holders, and, if anything remained after payment to them in full, to the holders of common units "in proportion to the number of interest units held by such certificate holders respectively," as is provided in Article 6. The language of Article 6 is clear and unambiguous and provides the same distribution whether the trust is terminated under Article

17 or the property is sold by the trust managers under Article 2. Whatever ambiguity or uncertainty is created by the original Article 17, relates only to the distribution of the proceeds of a sale of the trust property upon termination of the trust as therein provided, and has no effect whatever on the power or duty of the trust managers to sell the trust property under Article 2, or the distribution of the proceeds of a sale made under that article. The unit holders were not fully advised, by copies or otherwise, of the provisions of Articles 6, 16, and 17, so that they could judge the effect of these articles for themselves. No reference whatever was made to Article 2. All that the unit holders had before them were the conclusions of the trust managers and their counsel that there was a "serious doubt whether the trust managers have authority to authorize the sale of the property except pursuant to the provisions of Article 17, which covers the termination of the trust." This doubt is the foundation of their recommendation that the proposed amendment be approved as fair to both classes of unit holders. There is no substantial basis for it. It was the duty of the trust managers to give the unit holders facts, in addition to their conclusions. The unit holders had the right to rely upon the performance of that duty by the trust managers and were not required to go beyond the letter sent them to ascertain facts which the trust managers were obliged to disclose. *Farwell v. Pyle-National Elec. Headlight Co.*, 289 Ill. 157, 167. The statement of the trust managers being misleading and erroneous, the purported approval of the proposed amendment by the unit holders is ineffective and void. *Farwell v. Pyle-National Elec. Headlight Co.*, supra, *Gilman, C. & S. R. Co. v. Kelly*, 77 Ill. 426, 437. As the good or bad faith of the trust managers is not involved, it is immaterial whether they acted with or without the advice of counsel. The cases cited by defendants relating to the exercise of

discretionary powers by trustees have no application.

The plaintiffs acted promptly, filing their complaint within the time given for objections to the proposed amendments, and if the defendants were in doubt as to their rights or duties, they should have welcomed the opportunity to cooperate with the plaintiffs in getting a judicial construction of the trust agreement before taking from the preferred unit holders and giving to the holders of common units the sum of approximately $20,000, involved in this proceeding.

The decree of the trial court is reversed and the cause is remanded with directions to proceed in conformity with the views expressed in this opinion.

*Reversed and remanded with directions.*

MATCHETT, P. J., and O'CONNOR, J., concur.