EMILY BILTON, IRVING BILTON, BARNETT FINK and ETHEL FINK, (Plaintiffs), WILLIAM G. SOLDAN (Intervenor), Appellants, v. LINDELL TOWER APARTMENTS, INC., a Corporation, LUCIUS TETER, FRANK W. BLAIR and OSCAR E. BUDER, Individually and as Officers, Directors and Stock Trustees of Lindell Tower Apartments, Inc., and METROPOLITAN TRUST COMPANY, a Corporation, and FORREST M. HEMKER, as Trustees of Lindell Tower Apartments, Inc., VIOLA FRITSCH, EUGENIA BUDER, DOUGLAS ALLEN, AGNES ALLEN, RICHARD BOYLE, MRS. RICHARD BOYLE, FLORENCE DOOLING and MAE M. HALLIGAN, (Defendants) Respondents.— No. 40163.—213 S. W. (2d) 952.

Division One, September 13, 1948.

Rehearing Denied, October 11, 1948.

*Franklin E. Reagan, Adolph K. Schwartz* and *Sievers & Reagan* for appellants Emily Bilton, Irving Bilton, Barnett Fink and Ethel Fink, and *Reardon & Lyng* and *Jerome Simon* for intervenor appellant William G. Soldan.

*Eugene H. Buder* for respondent Oscar E. Buder, *R. H. McRoberts,* and *Bryan, Cave, McPheeters & McRoberts* for respondents Viola Fritsch, Eugenia Buder, Douglas Allen, Agnes Allen, Richard Boyle, Mrs. Richard Boyle, Florence Dooling, and Mae M. Halligan.

214

*Sonnenschein, Berkson, Lautmann, Levinson & Morse* and *Edward A. Haid* for respondents Lindell Tower Apartments, Inc., Lucius Teter and Frank W. Blair.

[953] DALTON, C.—This is a class action in equity, filed March 16, 1945, by plaintiffs, on behalf of themselves and all other bondholders similiarly situated, to enjoin and, thereby, prevent final consummation of a proposed ten year extension of $477,100 of outstanding and unpaid "reorganization mortgage registered bonds" issued by defendant Lindell Tower Apartments, Inc., a corporation. The bonds, which were secured by a deed of trust and chattel mortgage indenture (hereinafter referred to as the indenture) on assets of the corporation located in the City of St. Louis, had matured January 31, 1945. The proposed plan for extension of time of payment was in the process of being consummated when this suit was instituted.

Plaintiffs were the owners of $6500 par value of said bonds and William G. Soldan (Intervenor) was the owner of $2200 of said bonds. Plaintiffs had acquired their bonds at 70 percent of par value in May 1944, prior to the happening of the matters herein complained of. Equitable relief was sought on the ground that the provisions of the indenture authorizing such a ten year extension had not been complied with and, further, that the proposed extension was invalid by reason of fraud, misrepresentation and concealment of material facts in obtaining consents to extension from the owners of an alleged 75 percent of the par value of outstanding bonds. Plaintiffs charged that the consents filed with the indenture trustees had been obtained by false and fraudulent representations of persons standing in a fiduciary relationship to the bondholders and that such fiduciaries had failed to disclose material facts, including the bias and personal interest of said fiduciaries, who solicited and obtained the [954] consents. Plaintiffs further charged that the extension was not binding on the non-consenting bondholders (including plaintiffs and the intervenor); and that the bondholders as a class had been deprived of the equity in the corporation's real estate, amounting to a sum in excess of $7500, it being plaintiffs' theory that the bondholders were entitled under the indenture to the capital stock of the corporation upon default in the payment of the bonds *at maturity.* The trial court found the issues for defendants and dismissed plaintiffs' and intervenor's petition, approved the extension of the bonds, directed consummation of the proposed plan by the indenture trustees and entered judgment. Plaintiffs and intervenor have appealed.

Defendant Lindell Tower Apartments, Inc., a corporation (hereinafter referred to as the corporation) was the owner of the equity of

redemption in the mortgaged real estate upon which was located a fourteen story apartment building. The corporation had come into existence, had acquired title, executed the indenture and issued the bonds pursuant to a plan of reorganization which had had the approval of the circuit court of the City of St. Louis on January 16, 1935. Defendants Metropolitan Trust Company and Forrest M. Hemker were the indenture trustees.

The plan of reorganization contemplated that the capital stock of the corporation be held under a stock trust agreement by three stock trustees. This agreement, also incorporated into the indenture, provided for the issuance of stock trust certificates, evidencing the beneficial interest in the stock, which was held under the stock trust agreement. By the terms of the agreement, a majority of the stock trustees possessed, in effect, the powers of stockholders. The purpose intended was that the bondholders have a definite check on management and matters of policy of the corporation with respect to the operation of the corporate property securing the bonds. Two of the stock trustees were to be selected by the bondholders and were, at all times, to represent the bondholders, while the third trustee was to be selected by the owners of the beneficial interest in the capital stock of the corporation, evidenced by stock trust certificates issued under the stock trust agreement.

Under the plan of reorganization, the stock trust agreement was to terminate on a certain specified reduction of the outstanding bonds, "or whenever the deed of trust securing the many income bonds shall be released of record," or upon certain defaults. The stock trust agreement, as entered into, was dated January 16, 1935, and, as to termination, provided that "this agreement shall terminate in any event on the 31st day of January 1945, without notice by or to, or action on the part of the Stock Trustees or any other parties hereto . . ." The date of termination was the same as the maturity of the bonds. No provision was made for renewal or extension of the agreement. With reference to "the occurrence of any event of default under said indenture," the agreement provided that "it is the intention of this provision that upon receipt of the written notice from the Trustees under said Indenture advising the Stock Trustees of the existence of default under the said Indenture and the continuation of same for the prescribed time after written notice thereof to the person entitled to same, that it shall be obligatory upon the Stock Trustees to take such steps consistent with the terms of this Article to terminate this Agreement so that the Capital Stock Certificates and other assets in the hands of the Stock Trustees or the Depositary and Agent be delivered forthwith to the said Trustees under said Indenture for the benefit of the holders of Bonds secured thereby." The indenture provided for the termination of the stock trust agreement and the delivery of the stock to the indenture trustees,

if *certain* defaults were not cured within thirty days after written notice thereof by the indenture trustees to the mortgagor.

In September 1942, defendants Oscar E. Buder, Eugenia Buder, Douglas Allen, Agnes Allen, Richard Boyle and Mrs. Richard Boyle, collectively referred to as the "Buder Syndicate," acquired all of the stock trust certificates for all of the shares of stock of the corporation and, also, $105,100 par value of the bonds of the corporation, [955] secured as aforesaid, all for the price and sum of $55,-177.50. Title to the stock trust certificates was taken in the name of defendant Viola Fritsch and title to the bonds was taken and the bonds registered with the indenture trustees in the name of defendant Mae M. Halligan. Title to other bonds acquired by the syndicate was registered in the name of defendant Florence Dooling. On July 26, 1944, $80,100 in bonds was so registered and by December 12, 1944, the amount was $112,700. After these registrations, the named parties signed documents authorizing the syndicate members to transfer the bonds. Richard Boyle and wife have sold their beneficial interest in the "Buder Syndicate" to the other members thereof. It is admitted that defendants Viola Fritsch, Mae M. Halligan and Florence Dooling were straw parties acting for the "Buder Syndicate" and there was evidence, and the court found, that they have at all times acted under the direction of the beneficial owners.

After the "Buder Syndicate" acquired the stock trust certificates, defendant Oscar E. Buder was selected and became a stock trustee representing the interest of the holders of the stock trust certificates. He was made a defendant, individually and as an officer (vice-president) and director of the corporation and as a stock trustee. Defendants Lucius Teter and Frank W. Blair were the stock trustees representing the bondholders and they were, further, directors of the corporation. Defendant Teter was also the president of the corporation. The stock trust agreement (Art. VI, Sec. 7) permitted the stock trustees to become officers and directors of the corporation and, otherwise, to act as fully and freely as though not stock trustees.

In the summer of 1944, real estate in the City of St. Louis, such as that securing the bonds, was substantially increasing in value, but, according to defendant Teter, no loan could be obtained and no sale could be had of the property for a sufficient sum to pay off the bonds and no effort along that line was made. In this connection it appears that Teter relied largely upon the judgment of the assistant secretary of the corporation, Arthur F. Mohl, whose firm was managing the building and acting as fiscal agent of the corporation. It was stipulated that real estate of the type "of Lindell Tower in the City of St. Louis" had tended to rise in value since the summer of 1944, down to and including the time of the trial, February 11, 1946.

Plaintiffs' evidence tended to show that the real estate security for the bonds was reasonably worth from $450,000 to $500,000 in July and August 1944; and was going up in value; and that it had a value of $500,000 at the maturity date of the bonds. Defendants' evidence indicated that the value of the property did not equal the par value of the outstanding bonds; and that, even if the property had had a value of $500,000 its maximum loan value was only 65 percent or not to exceed $325,000. In deference to the trial court's finding that the extension of the bonds was not detrimental to the bondholders and the further finding for defendants, we should reject plaintiffs' evidence as to the value of the security for the bonds.

The indenture authorized the extension of the time of payment of the bonds for ten years from January 16, 1945, with the assent of the owners of 75 percent of the outstanding bonds, upon compliance with certain specified conditions, towit, (1) the deposit of the required consents, in writing, executed by the owners in form satisfactory to the indenture trustees and ''accompanied by such evidence as they may require that the signatories are the owners of the bonds therein described''; and (2) the deposit with the indenture trustees *prior* to the consummation of said extension of sufficient funds to pay all costs, fees and expenses incident to the extension.

On June 21, 1944, a joint special meeting of the Board of Directors and Stockholders of the corporation was held in Chicago, Illinois. The capital stock of the corporation was represented by Teter and Buder, a majority of the stock trustees. Teter and Buder were the only directors present. It was determined that the best interest of the corporation and the bondholders required that the time of payment of the outstanding [956] bonds of the corporation be extended. By resolution the officers of the corporation were ''authorized and directed to solicit the assents of the holders of outstanding bonds to the extension'' and to take all necessary steps to carry the extension into effect, supplementing the indenture and extending the stock trust agreement.

A written request for the extension of the bonds was thereafter made by defendants Mae M. Halligan and Florence Dooling. The request, dated June 26, 1944, was produced in court (apparently on notice) by a member of the firm of attorneys representing Teter and Blair. It was addressed to ''Lindell Tower Apartments, Inc., Lucius Teter, Oscar E. Buder and Frank W. Blair, as stock trustees for capital stock of Lindell Tower Apartments, Inc. under stock trust agreement dated as of January 16, 1935.'' It stated that the writers were owners of bonds of the corporation in substantial amount maturing January 31, 1945; that it would be for the best interest of all the bondholders and the corporation that the time of payment be extended for ten years; that they were willing to advance sufficient funds for the payment of the expenses required under the indenture

(they to be reimbursed by the corporation when funds were available.) The letter further stated: "To this end we deposit with Sonnenschein, Berkson, Lautmann, Levinson & Morse attorneys, the sum of $4771 which sum may be used to pay all out-of-pocket expenses . . ." The expenses authorized included the expenses of the indenture trustees for the proposed extension and attorney fees to the Sonnenschein firm. The letter continued: "We also agree to pay the stock trustees the sum of $1500 for their services to be rendered in effecting the extension of the time of payment of the bonds. Said $1500 may be disbursed from the deposit of $4771. It is understood and agreed, however, that the said sum of $1500 shall not be charged to the corporation and that the undersigned will not seek reimbursement thereof from the corporation." It was also stated that, if sufficient consents were not obtained, only the out-of-pocket expenses, the $2000 to the indenture trustees and a fee to the Sonnenschein firm were to be paid from the deposit and the balance "returned to Douglas Allen for and on behalf of the undersigned." (Allen was a member of the "Buder Syndicate.")

The fact of this request and the signatures of the parties thereto were admitted below and the receipt of the letter and the fact of the agreement was not questioned in either the trial court or in this court. The brief of Teter, Blair and the corporation admits that the stock trustees procured this formal written request for extension from the holders of 25 percent of the bonds before submitting the proposal to the rest of the bondholders. There was evidence that $4771 had been deposited with counsel for the stock trustees and the corporation, that is, with "the Sonnenschein firm"; and that the corporation did not put up any of the money.

Thereafter, on July 1, 1944, the corporation and the stock trustees caused a letter to be mailed to all of the registered bondholders recommending the immediate execution of consents to a ten year extension of the bonds. The letter was prepared, at the direction and under the personal supervision of the stock trustees, by a member of the Sonnenschein firm with whom the $4771 for fees and expenses had been deposited. The letter was signed by the corporation by Lucius Teter, president, and further by Teter, Blair and Buder, as stock trustees. Briefly the letter recited the facts as to the impending maturity of the bonds, the extension provisions of the indenture, the corporation's lack of funds to pay the principal of the bonds at maturity and the improbability of securing a sufficient new loan for that purpose. It is stated that holders of more than 25 percent of the bonds had requested that steps be taken to effect an extension of time of payment and it referred to the possible alternatives to an extension as bankruptcy and another reorganization involving expenses and cessation of interest payments. The letter gave some past and current financial data, including an income and expense statement for the preceding two years, and advised that Mr. Buder

represented a "group" which **[957]** had acquired all the stock trust certificates. It stated that in the event of certain defaults the stock trustees were required to deliver the stock to the indenture trustees as additional security for the bonds; that the stock trust agreement could be extended with the consent of the stock trust certificate holders, giving the bondholders the benefit of that agreement; and proceeded as follows: "The undersigned stock trustees, who are also directors and officers of the corporation, believe that it is to the best interest of the holders of the bonds as well as the holders of the stock trust certificates that the time of payment of the bonds be extended as aforesaid. . . . If sufficient consents are deposited it will permit the uninterrupted payment of interest."

After the letter of July 1, 1944, had been mailed to the bondholders, Irvin Bilton, one of the plaintiffs, communicated with the corporate indenture trustee and objected to the extension and to the contents of the letter. Bilton contended that an extension would leave the corporation in control for ten years without the payment of consideration; that an extension amounted to speculation on the value of the real estate during that period; and that the July 1, 1944, letter did not show the bonds owned by the stock trustees. He requested a list of the bondholders or, that a letter be sent to the bondholders stating his views in opposition to the extension. He was referred to the Sonnenschein firm and saw Mr. Satinover, who had assisted the stock trustees in preparing the letter of July 1, 1944. Thereafter Mr. Bilton prepared a letter, dated July 20, 1944, to be sent to the bondholders. The letter stated objections to the proposed extension of the bonds, made certain accusations and insinuated that all of the stock trustees and directors owned bonds included within the 25 percent requesting the extension. Teter and Blair owned no bonds and had no beneficial interest in the stock and, upon advice of counsel, the stock trustees declined to recommend to the corporate indenture trustee (who had the only list of bondholders) that the Bilton letter be mailed to the bondholders. A careful consideration of the content of this letter in the light of the facts shown in this record does not disclose any unfairness on the part of the stock trustees in refusing to cooperate in having this letter forwarded to the bondholders.

Thereafter, on August 3, 1944, the stock trustees prepared and caused to be mailed to all bondholders, *who had not theretofore filed consents to extension,* a letter which stated that holders of $246,100 of par value of bonds had consented to the proposed extension of the bonds. ($185,300 of these consents were filed by the "Buder Syndicate" on July 26, 1944.) It pointed out that, if sufficient consents were not received, the bonds would mature and go into default and it reviewed the possibility of reorganization, litigation, expense and loss of interest which might ensue. Immediate consent

to the proposed extension was again recommended. The letter stated that Teter and Blair owned no bonds and that Buder represented the assignees of the stock trust certificates, had a minority interest therein and had an equitable interest in $105,100 of bonds. Certain arguments of an objector against postponing the maturity date of the bonds were mentioned. The letter further stated ". . . your trustees urge you to reach a conclusion at your earliest convenience."

Ultimately, consents were received from the holders of a total of $377,400 par value of the bonds (more than 75 percent of the outstanding bonds) and such consents (as the trial court found) were in form satisfactory to the indenture trustees and were accompanied by such evidence as said trustees required that the signatories were the owners of the bonds described in the consents. The corporation then executed and delivered an amendment of the indenture and Viola Fritsch, the record holder of all of the outstanding stock trust certificates, the Stock Trustees and the depositary executed an amendment extending the term of the Stock Trust Agreement. Other facts will be stated in the course of the opinion.

■ Appellants urge that "the court erred in refusing to decree that appellants and the other bondholders are now the owners [958] of all of the stock of Lindell Tower Apartments, Inc." This contention is based on the theory that, under the indenture, title to the stock vested in the bondholders by reason of the default in payment of the bonds *at maturity*. Respondents contend that the indenture contains no unambiguous provision for such delivery of the stock to the indenture trustees for the benefit of the bondholders upon default of payment of the bonds *at maturity* and insist that "the failure to pay the bonds at maturity was specifically excluded from the events of defaults" requiring delivery of the stock to the indenture trustees. The contention as to ambiguity is not without some merit. The evidence further shows that, in the summer of 1944 and prior to the maturity of the bonds, it was well known to the stock trustees, who were also officers and directors of the corporation, that any demand by the indenture trustees upon the stock trustees for the stock of the corporation in the event of default in the payment of the bonds *at maturity* would result in litigation. The indenture trustees, with knowledge that the bonds were not so paid, gave no such notice as required by the indenture and made no demand upon the stock trustees for the stock of the corporation, and the trial court so found. Thirty days notice was required by the indenture. On the record presented, we may not further construe the alleged forfeiture provision of the indenture, nor determine the bondholders' right to either ownership or distribution of the stock. The assignment of error is overruled.

■ Appellants contend that the contemplated extension of the bonds was invalid and should have been enjoined because of the failure of the stock trustees, while acting in the capacity of advocates

of the proposed extension, to disclose to the bondholders material facts within their knowledge, which the bondholders were entitled to know and which were material to a decision on the matter of proposed extension of the bonds. It is contended that the stock trustees did not disclose (1) the fact of Buder's conflicting interest by reason of the *ownership* of an interest in the stock equity which would be lost if the bonds were not extended; (2) the identity of the promoters of the extension, who were straw parties for the "Buder Syndicate"; (3) the corporation's true financial condition by enclosing a balance sheet showing assets and liabilities; (4) the fact that on default the stock trust agreement would terminate and the stock equity would become the property of the bondholders; (5) the fact that the plan for extension of the bonds was designed to preserve the stock equity, which the "Buder Syndicate" would lose and the bondholders would gain, if the bonds were not extended; and (6) the fact "that someone had advanced $4771 in the name of the straw parties, Halligan and Dooling, to finance the proposed bond extension program and to buy the services of Buder, Blair and Teter for $1500."

Trustees are obliged to àct with loyalty, fidelity and integrity, and are held accountable to the faithful performance of their trust. Koplar v. Rosset, 355 Mo. 496, 196 S. W. (2d) 800; Monticello Bldg. Corp. v. Monticello Inv. Co., 330 Mo. 1128, 52 S. W. (2d) 545. A trustee in dealing with the beneficiary in the trustee's own interest is under a duty to deal fairly and in good faith and to communicate to him all material facts in connection with the transaction which the trustee knows or should know. Winchell v. Gaskill, 354 Mo. 593, 190 S. W. (2d) 266; Hockenberry v. Cooper County State Bank, 338 Mo. 31, 88 S. W. (2d) 1031, and cases therein cited; Vol. 1, Restatement of the Law of Trusts, Sec. 170, p. 431 et seq.; Shapiro et al. v. Chicago Title and Trust Co. et al., 328 Ill. App. 650, 66 N. E. (2d) 731. In the Shapiro case, trust managers were vested with direction of the affairs of a trust to the benefit of preferred and common unit holders. The trust managers (although they were required by the trust instrument to merely notify the beneficiaries of a proposed amendment of the trust instrument, "briefly specifying the nature of such proposed amendment") represented the proposed amendment to be fair to both preferred and common unit holders. "In so doing they became *advocates,* urging the adoption of the amendment. *It thereupon became their duty to disclose fully and fairly to the unit holders* [959] . . . *all facts upon which such holders were required to exercise judgment in determining whether to approve or oppose the amendment.*" (Italics ours.)

Respondents do not question these principles of law. They concede that this court must determine whether or not the recommendations of the trustees were made in good faith and adequately apprised the bondholders of the material facts. Respondents insist

that the only issue in the case is whether the bondholders were misled; and that the issue concerns "the legal results to follow from undisputed facts." Respondents admit that Teter and Blair stood in a fiduciary relationship to the bondholders; that they were the bondholders' representatives under the plan of reorganization; and that Teter, Blair and Buder, the stock trustees, became *advocates* of the proposed extension of the bonds. There can be no doubt that the stock trustees did assume the position of advocates and urgently recommended the execution of consents to extension of the bonds. Respondents further say that two interests are involved, towit, the "Buder Syndicate" as the beneficial owner of the stock, and the owner of the bonds on the one hand, and the remaining bondholders on the other. Respondents admit that Buder (who was an officer and director of the corporation, the beneficial owner of an interest in its stock and a stock trustee representing the stock trust certificate holders) in dealing with the corporation's creditors and in advocating an extension of the bonds was required to fully and fairly disclose his *adverse interest* to the bondholders. There is no contention that in so dealing, Buder could misstate material facts or mislead the bondholders.

The letters of the stock trustees to the bondholders correctly advised concerning many facts necessary to a decision on the issue presented, but the letter of July 1, 1944, did not disclose that Buder, as a member of the "Buder Syndicate," had an interest as beneficial *owner* of the stock and was the *owner* of bonds. Nor did the letter disclose that the "Buder Syndicate", the beneficial owner of the stock, was the promoter of the extension. It stated only that Buder represented a *group* which had acquired the stock trust certificates. The Teter, Blair and Buder briefs concede that Teter and Blair knew that Buder's group owned bonds and that Buder was associated with and represented an adverse interest. We think the record so shows. On the other hand, appellants contend that Teter and Blair did not know that Buder and his syndicate were the owners (of the 25 percent of the bonds) asking the extension; and that "Buder concealed the ownership of the Buder Syndicate bonds from the other two trustees, Blair and Teter." The letter of August 3, 1944, which was sent only to the bondholders *who had not filed consents,* stated that Buder personally had a minority interest in the stock trust certificates and was the equitable owner of a substantial number of bonds originally owned by the Central States Life Insurance Company ($105,000.) The letter did not advise the bondholders that the "Buder Syndicate" had acquired more bonds than the $105,000 formerly owned by the Central States Life Insurance Company; and that, on July 26, 1944, defendant Dooling, a straw party for the "Buder Syndicate," had filed consents to extension covering $80,100 of additional bonds.

While the true facts concerning Buder's personal relationship to the "Buder Syndicate" were well known to defendant Buder, the

record fails to show that either Teter or Blair knew of the true relationship existing between defendants Fritsch, Halligan and Dooling, on the one hand, and defendant Buder and the "Buder Syndicate" on the other. The interests of the "Buder Syndicate," as such, did not appear of record, other than by defendant Fritsch's selection of Buder as a stock trustee representing the holders of the stock trust certificates and by Buder's statement to Teter that his clients, who owned bonds and stock trust certificates, favored the extension of the bonds and would consent to the extension of the stock trust agreement. Buder, however, testified that the original request for extension started with him alone. The bondholders filing consents prior to August 3, 1944, were never advised as to the additional facts stated in the letter of August [960] 3, 1944. None of the bondholders from whom consents were solicited were advised at any time that the owners of the beneficial interest in the corporation's stock (an adverse interest) were financing the campaign for extension or that these parties were the owners of the 25 percent of the bonds referred to in the letter, or that they had tendered the payment of fees to the stock trustees to advocate and obtain the extension. These relevant and material facts were not disclosed. The letters left the impression that the bondholders asking the extension had a common interest with, and occupied similar positions to, the bondholders to whom the letters were directed, but such was not the fact because of the adverse interest of which the stock trustees knew.

No balance sheet showing assets and liabilities was submitted to the bondholders, but only a report showing earning and disbursements during 1942 and 1943, such as had been theretofore sent annually to the bondholders. The corporation's balance sheet, dated January 31, 1944, showed the assets of the corporation to be $564,-706.74, $546,642.48 represented the encumbered property, but such valuation was without deduction for depreciation since 1935 and did not reflect the current market value of the corporation's assets. Clearly, no valuation of assets satisfactory to all parties could have been obtained. A failure to enclose the balance sheet of January 31, 1944 violated no duty of the stock trustees.

The stockholders were not advised that in the event of default in payment of the bonds at maturity the stock would become the property of the bondholders, but the stock trustees had received legal advice concerning the alleged ambiguity of the indenture on this issue and knew that a demand for the stock would result in litigation. The letter of July 1, 1944, did advise as to the termination of the stock trust agreement on January 31, 1945; and that "in the event of certain defaults" the stock trustees were required to deliver the stock to the indenture trustees. In issuing the letters and soliciting consents to extension, the stock trustees were not required to anticipate the ultimate legal construction that might be placed upon the indenture

as to ultimate stock ownership in case of default at maturity and notice and demand for the stock by the indenture trustees. . .

Should the stock trustees have disclosed the deposit and proposed payment to them of a $1500 fee for soliciting and obtaining consents to the proposed extension? The duties and obligations of the stock trustees, in their official capacities as such, were fully set forth in the stock trust agreement. (We have noted that they possessed, in effect, the powers of stockholders.) The agreement provided for reasonable compensation and expenses for the performance of the duties and obligations *imposed by the agreement itself* and the evidence shows that the stock trustees were paid $120 per year each for the discharge of their duties thereunder. Whether additional compensation and expenses were paid to them as officers and directors of the corporation does not appear. Respondents point to no provision of the stock trust agreement which imposed any duty or obligation upon the stock trustees, in their official capacities as such, to aid or oppose the bondholders in extending the bonds, renewing or extending the stock trust agreement, or in retaining themselves as stock trustees in the effective control of the corporation and its property.

In advocating the extension of the bonds, and in soliciting consents to extension in their official capacities as stock trustees, Teter, Blair and Buder did not advise the bondholders that two registered bondholders (Halligan and Dooling) had deposited $4771 with the attorneys for the stock trustees and the corporation to cover fees and expenses in effecting the extension. Nor did they advise the bondholders that $1500 of the sum deposited with their attorneys was to be paid to them "for their services to be rendered in effecting the extension of the time of payment of the bonds" and that such payment would not be made unless sufficient consents were obtained and the extension consummated. It [961] will be noted that the $1500 was not to be charged to the corporation; that the letter was addressed to Teter, Blair and Buder in their official capacities as stock trustees; and that subsequent to the date of the letter, Teter, Blair and Buder assumed the role of *advocates* and solicited consents to extension in such official capacities. The fiduciary relationship of Teter and Blair to the bondholders, as bondholders' representatives, is of course admitted.

Respondents seek to justify the proposed fee as authorized by the stock trust agreement, but that agreement imposes no such duties of *advocacy* of the renewal of the agreement or of the extension of the bonds. The performance of no official duties as stock trustees was solicited by Halligan and Dooling. One brief states that the amount "was purely nominal, considering the effort and responsibility involved," and that "the real significance of the Buder Syndicate's agreement to pay $1500 was not that the trustees were receiving some sort of secret compensation, but that the bondholders were being

relieved, to the extent of $1500 of an obligation which they otherwise would have been required to bear." Another brief states that "the agreement of Halligan and Dooling to pay their compensation could not have motivated the action of Teter and Blair." Another brief insists that "Teter and Blair arrived at the conclusion that the bonds should be extended as a result of independent discussions . . . extending over a period of six months prior to the letter of June 26, 1944." Respondents further seek to justify the amount of the offer as reasonable on the theory that the stock trustees could have charged the bondholders for their services in soliciting consents even if the extension had failed for lack of sufficient consents.

We think the record shows that the $1500 was tendered for services of advocacy neither authorized nor contemplated under the terms of the stock trust agreement. While the evidence does not show that the stock trustees had demanded or received such fee for their services, it was deposited with their attorneys, they knew of and had acted upon the request and had recognized the fact of the request in their letter of July 1, 1944. They had not repudiated the proposed payment. Knowledge of the proposed fee and the fact of its deposit was not denied by any of the stock trustees.

Respondents insist that "there was no evidence, direct or indirect, from which an inference could be drawn that defendants Teter and Blair were acting as the paid agents of the "Buder Syndicate," with their judgment and decision on the subject of the extension of the bonds being influenced, controlled and dominated by such employment." We need not determine that issue, nor need we determine whether they were entitled to compensation for advocacy of the extension, nor whether the tendered $1500 was reasonable compensation. The question here is: Did the stock trustees make a full and fair disclosure of the relevant and material facts to the bondholders when they assumed the role of *advocates* and recommended the execution of consents to the extension of the bonds? Clearly, the stock trustees failed to reveal to the bondholders that Halligan and Dooling had deposited $1500 with the attorneys for the stock trustees to pay the stock trustees for their *services* in obtaining consents to extension, that is, if sufficient consents were obtained and the extension consummated.

We are not here concerned with whether the stock trustees' judgment and recommendations to extend the bonds and renew the stock trust agreement were sound or unsound, or whether the proposed extension was favorable or unfavorable to the bondholders, or whether the stock trustees' judgment would have been influenced by the proposed fee. These matters were for the determination of the bondholders upon proper information and advice. The bondholders, however, were entitled to have been advised that their own representatives, Teter and Blair, were to be paid by the "Buder Syndicate" to obtain

228

the consents. In re Conrad, 340 Mo. 582, 105 S. W. (2d) 1; Dudley v. Mealey, 147 F. (2d) 268.

█ The material facts in this cause are not in dispute, only an issue of law is presented. It is, therefore, immaterial that the trial court found that the letters of [962] July 1 and August 3, "set forth all material facts and information in connection with the proposed extension of the bonds." The validity of the extension turns upon the validity of the consents filed. If the consents are invalid, the extension was unauthorized and the non-consenting bondholders are not bound. We must hold that the consents obtained on the basis of the facts stated in the two letters of the stock trustees to the bondholders were not obtained upon a full, fair and adequate statement of material facts necessary to the exercise of an intelligent judgment on the matter of extending the bonds, and that the consents so obtained are invalid. Rothschild v. Jefferson Hotel Co., D. C., 56 F. Supp. 315, 327; Shapiro v. Chicago Title & Trust Co., supra; Fox Realty Co. v. Montgomery Ward & Co., 124 F. (2d) 710; Cohn v. Kramer, 124 F. (2d) 791, 799. The proposed extension on the basis of said consents should be enjoined. The removal of the stock trustees as officers and directors of the corporation is denied.

The judgment is reversed and the cause remanded with directions to enjoin the extension of the bonds on the basis of the consents now on file with the indenture trustees and for such further proceedings as may be required not inconsistent with this opinion. It is so ordered. *Brádley* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court.

*Douglas, P.J.,* concurs in separate opinion. *Clark, Conkling* and *Hyde, JJ.,* concur and concur in separate concurring opinion of *Douglas, P.J.*

DOUGLAS, P. J. (concurring).—I concur in the decision reached in the principal opinion, and in all of its findings with but one exception.

█ The principal opinion shows that Bilton, one of the plaintiffs, wanted to write the bondholders expressing his views opposing the extension. The list of bondholders and their addresses was in the sole custody of the corporate trustee of the mortgage indenture. Bilton requested the corporate trustee that it either furnish him a list of the bondholders or transmit a letter from him to the bondholders setting out his objections to the extension. In response to his request the corporate trustee referred him to the law firm which was representing both the apartment corporation and the stock trustees. This law firm had assisted the stock trustees in preparing their first letter to the bondholders which the corporate trustee had transmitted.

On the advice of this law firm the stock trustees declined to recommend to the corporate trustee that it transmit Bilton's letter to the bondholders. The apparent ground of the stock trustees' refusal was that a statement in Bilton's proposed letter was not entirely correct. He stated therein: "We believe that a considerable portion, if not all of these bonds, are owned or controlled by one or more of the following persons, namely, Lucius Teter, or Frank W. Blair, or Oscar E. Buder, *who are also the directors* and *officers* of the *corporation,* and whose stock interest comes after our bonds." The true fact was that only one of those named, Buder, through the Buder syndicate, owned and controlled any bonds. So in stating the alternative that more than one of the stock trustees might own bonds, Bilton's belief was not precisely accurate.

We do not find the stock trustees suggested the proposed letter be corrected. Nor did they offer to recommend the mailing of the letter together with their own statement setting out the true fact. Their failure to cooperate becomes more significant when viewed in the light of their own letter later transmitted by the corporate trustee to the bondholders. In that letter they made a definite misstatement about the amount of bonds in which Buder had an equitable interest. They limited the amount to $105,000, the bonds acquired from the Central States Life Insurance [963] Company. They failed to disclose the additional $80,100 of bonds then owned by the Buder syndicate. So we find the stock trustees refusing to aid Bilton because his letter stated his belief which was not precisely accurate, and then procuring the aid of the corporate trustee in sending out their letter which was positively inaccurate.

Thus we find the stock trustees in a somewhat anomolous position. They, as representatives of the bondholders, were sending letters to the bondholders through the corporate trustee soliciting consents to an extension of the bonds. At the same time they refused on a highly technical ground to aid in opening the door to admit the views of a bondholder opposing the extension.

The effect of the refusal of the stock trustees was to prevent a full disclosure of the true picture to the bondholders whom they were representing. I think this was unfair on their part. This does not show high good faith in the use of their judgment.

Accordingly, I disagree with the findings of the principal opinion that such refusal did not disclose any unfairness on the part of the stock trustees. I think it did.

*Clark, Conkling* and *Hyde, JJ.,* concur and concur in separate concurring opinion.